**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Ruth McNee a/k/a Ruth Koscielak,

Plaintiff,

v.

Jim Gustafson, Chuck Dickemann, Infinity Broadcasting Corporation, and Infinity Media Corporation d/b/a WCCO AM,

Defendants.

Civil No. 00-1096 (DWF/SRN)

**MEMORANDUM OPINION AND ORDER**

---

Sheila A. Engelmeier, Esq., Karen A. Janisch, Esq., and Autumn L. Huiras, Esq., Rider Bennett Egan & Arundel, 2000 Metro Center, 333 South Seventh Street, Minneapolis, MN 55402, counsel for Plaintiff.

David J. Goldstein, Esq., Kristen M. Ludgate, Esq., Angela M. Crandall, Esq., Faegre & Benson, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-3901, counsel for Defendants.

---

## Introduction

The above-entitled matter is before the undersigned United States District Judge pursuant to Defendants' Motion for Summary Judgment, Plaintiff's Motion to Strike, relating to portions of Defendants' memorandum of law in support of the Motion for Summary Judgment, and Plaintiff's Motion for Supplemental Briefing. In the Third Amended Complaint, Plaintiff alleges the following claims against Defendants Infinity Broadcasting Corporation and Infinity Media Corporation, d/b/a WCCO AM: (1) gender discrimination in employment in violation of the Minnesota Human Rights Act and Title VII of the Civil Rights Act of 1991; (2) age discrimination in employment in violation of the Minnesota Human Rights Act and the Age Discrimination in Employment Act; (3) discriminatory reprisal in violation of the Minnesota

JUN 2 0 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Human Rights Act and Title VII of the Civil Rights Act of 1991; (4) breach of contract; (5) defamation; and (6) intentional infliction of emotional distress. Plaintiff alleges the following claims against Defendants Jim Gustafson and Chuck Dickemann: (1) aiding and abetting unlawful discrimination in violation of the Minnesota Human Rights Act; (2) defamation; (3) tortious interference with contract; and (4) intentional infliction of emotional distress. For the reasons set forth below, Defendants' motion is granted in part and denied in part, and Plaintiff's motions are denied.

## Background

Defendants Infinity Broadcasting Corporation and Infinity Media Corporation d/b/a WCCO AM (collectively "WCCO") are Delaware corporations which, during all times relevant to this litigation, owned, operated, and licensed WCCO AM, a Minneapolis radio station. Defendant Jim Gustafson ("Gustafson") was, at all relevant times, the general manager of WCCO. Defendant Chuck Dickemann ("Dickemann") was, at all relevant times, the program director at WCCO.

Plaintiff Ruth McNee a/k/a Ruth Koscielak ("McNee") was hired as an announcer by WCCO in 1981. WCCO's format is generally a "talk radio" format, and McNee hosted her own two- to three-hour show every weekday for most of the tenure of her employment with WCCO. From 1995 until she was terminated in 1998, McNee's show ran during the "midday" time slot, from 12:00 noon to 3:00 p.m.[1]

[1] The term "midday" is used to describe the hours of 10:00 a.m. to 3:00 p.m. The 5:00 a.m. to 9:00 a.m. time slot is called the "morning drive," and the 3:00 p.m. to 6:00 p.m. time slot is called the "afternoon drive."

In addition to on-air announcing, McNee did "personalizations": personalized adds for WCCO advertisers. Plaintiff asserts that, over an 18-month period in 1996 and 1997, McNee generated over $671,000 in advertising sales from her personalizations. Even if this figure is off, the record is clear that McNee was in high demand for personalizations and had a waiting list of advertisers wishing to use her.

In 1994, McNee complained of sexual harassment by one of her co-workers. After approaching management about her complaints, McNee retained an attorney who threatened litigation. The matter settled in 1995. The terms of that settlement–including the facts underlying the complaint–are confidential.

McNee asserts that, in the wake of the settlement, some of her male co-workers called McNee a "man hater," characterized her show as "manbashing," and made joking remarks about being afraid that McNee would sue them next. McNee further alleges that many WCCO employees, even employees who were not around in 1995, were aware of the terms of the settlement but that she, herself, never disclosed such information.

McNee and WCCO began negotiating her final personal services contract ("PCS") in June of 1995. The PCS covered a term from July 15, 1995, through July 14, 1998.

During the time period in question (1995-1998), WCCO was experiencing slumping ratings and, as a result, slumping profits. Management at WCCO were particularly concerned about the ratings for the midday shows and, even more specifically, McNee's show. Examination of the various ratings measures for shows during this time period indicates that McNee's show was not faring particularly well, but it fell less than some other shows during this time period and, using some measures of ratings, its ratings were higher than some other midday shows.

During the time period in question, WCCO management began vigorously overseeing McNee's show. McNee was told to eliminate "fluff" topics from her show, such topics including bulimia, PMS, and menopause. McNee was told that she could no longer tape her interviews. McNee was criticized for the amount of preparation she did for her shows and the amount of time she spent at the station, as opposed to preparing at home. McNee met almost daily with Dickemann beginning in September of 1997. McNee alleges that these meetings were confrontational and abusive.

In addition, McNee alleges that she was penalized in the terms and conditions of her employment.[2] She alleges that she was required to stay at the station during Twins games when those games overlapped her regular time slot so that she would be ready to go in the event of a rain delay or cancellation; McNee asserts that no other on-air personalities were required to stay at the station during games, but rather were permitted to stay at home and simply be ready to come in in the event of rain. McNee also alleges that she was repeatedly denied office space, that she was forced to use a call screener rather than a more qualified producer, and that her producer was excluded from meetings with management about show content. McNee asserts that she was told that a show on Nixon would be untimely and inappropriate and that she was chastised for suggesting it, but another announcer did a Nixon show that same week and was praised for it. She also contends that her time slot was changed repeatedly and that the station kept adding "filler" programming during her show, breaking up the show's continuity.

---

[2] The Court agrees that most, if not all, of these complaints regard changes to McNee's work environment which did not materially affect her employment and are thus not actionable in and of themselves. However, they are relevant to the issue of discrimination to the extent that they demonstrate animus towards McNee and show that WCCO was setting McNee up to fail.

McNee alleges that she was deprived of the opportunity to engage in two specific promotional activities. First, McNee had hosted a number of travel tours for a local travel agency; when approached by the agency, however, WCCO indicated that McNee would be unavailable for further trips. Similarly, McNee had on two occasions done a remote broadcast of the Rose Parade in Pasadena, California. These remote broadcasts were done at the behest and expense of Target Corporation, which had specifically requested McNee. When Target Corporation again requested that McNee make the trip to perform the remote broadcast at the January 1, 1998, Rose Parade, WCCO indicated that McNee was unavailable; WCCO suggested a number of other radio personalities who could do the broadcast, but Target decided to abandon the project altogether if McNee could not go.

Throughout the time period in question, McNee was concerned that her treatment at WCCO was a result of her gender and/or her 1994-1995 dispute with the station. In September of 1997, McNee's husband called the president of the company, Dan Mason. Mr. McNee asserts that he called Mason because, in 1995, the previous company president had told McNee to contact headquarters directly if she experienced any further problems. Mr. McNee's conversation with Mason was short, and Mason informed Mr. McNee that Ruth McNee should take her concerns directly to Jim Gustafson. Mason felt that the call was "inappropriate," and he called Gustafson to inform him about it.

Also in September of 1997, McNee's attorney met with Gustafson to voice McNee's concerns about discrimination.

On September 17, 1997, Dickemann wrote a memo calling McNee "lazy."[3] In the following months, Dickemann wrote a number of additional memos critical of McNee's ratings, her show, and her work ethic.

In March of 1998, Dickemann asked McNee to meet him the following Monday morning at a hotel bar near the station. When McNee arrived mid-morning, she found both Dickemann and Gustafson waiting for her. They told her that they had some "exciting changes" to the midday programming, but those changes did not include McNee. They gave her a press release which announced that McNee was leaving WCCO. Apart from the fact of McNee leaving the station, the press release said nothing else about McNee. McNee asked if she was being fired, and Gustafson told her she was, because she was "unsuitable." McNee was denied the opportunity to return to the station to clean out her desk and say goodbye to co-workers.

Gustafson and Dickemann provided McNee with a release that she could sign in return for a severance package. McNee asked to speak to her attorney first.

News of McNee's departure from WCCO was broadcast on the local news at 11:30 that morning. Although the news broadcast did not provide a reason for McNee's departure, it quoted Gustafson as saying that "the changes address the station's need to strengthen its mid-day audience."

After McNee was terminated, WCCO refused requests by advertisers to use McNee's voice in ads. Gustafson admits that this was unusual.

---

[3] Dickemann's calendar indicates that he met with Gustafson on September 16, and Gustafson has testified that, at that meeting, he may have told Dickemann about Mr. McNee's call to Mason.

## Discussion

### 1. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

### 2. Gender Discrimination, Reprisal, and Aiding and Abetting

The Court will not devote significant time to these claims, as the record clearly indicates that numerous issues of material fact exist. From the statements made about McNee's show, the differential treatment of McNee, and the condemnation of shows on "female issues," a reasonable jury could find that WCCO's treatment of McNee was motivated by gender animus.

Moreover, a reasonable jury could find retaliatory animus based upon the increased criticism in September of 1997, after McNee again complained of gender discrimination to Mason. Finally, given McNee's evidence of her profitability to the station, her expert evidence regarding ratings, and her evidence of the station's willingness to alienate advertisers in order to deprive McNee of certain advertising opportunities, a reasonable jury could conclude that WCCO's articulated nondiscriminatory reasons for its behavior are all pretextual.

With respect to McNee's allegation that Dickemann and Gustafson aided and abetted discrimination in violation of the MHRA, Defendants assert that the MHRA does not impose individual liability on supervisors. The cases Defendants cite in support of this position, however, are inapposite. In *Waag v. Thomas Pontiac, Buick, GMC, Inc.*, 930 F. Supp. 393 (D. Minn. 1996), the court simply found that an individual supervisor was not an employer under the MHRA; the *Waag* court did not address the aiding and abetting provision of the MHRA at all, and the aiding and abetting provision of the MHRA imposes liability on "persons," not simply "employers." In *State by Beaulieu v. RSJ, Inc.*, 532 N.W.2d 610 (Minn. Ct. App. 1995), the Minnesota Court of Appeals considered whether a corporate shareholder could be held responsible under the aiding and abetting provision; the court concluded that, as the shareholder was already responsible for any liability incurred by the corporation by virtue of his shareholder status, it was inappropriate to also hold him liable under a theory of aiding and abetting. Similarly, in *State by McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844 (Minn. 1985), the Minnesota Supreme Court held that business owners could not be held liable under an aiding and abetting theory because, basically, they *were* the corporation and they could not aid and abet themselves.

McNee has offered only a cursory footnote restating the substance of Minn. Stat. § 363.03, subd. 6, and stating that Dickemann and Gustafson violated it. While this "argument" is not particularly helpful, the burden in a motion for summary judgment rests upon the moving party, and so the Court is not inclined to grant summary judgment in the absence of a compelling argument by the Defendants. Under the circumstances, the Court declines to grant summary judgment on the aiding and abetting claim at this time.

**3. Age Discrimination**

McNee's claim for age discrimination fails. To state a *prima facie* case for age discrimination, McNee must show, *inter alia*, that age was a factor in her termination. *See Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th Cir. 2001). Typically, this element of the *prima facie* case can be satisfied by showing that the employee was replaced by someone younger. *Id.* Indeed, McNee asserts that this happened to her. However, WCCO first gave half of her time slot to Tim Russell, an announcer who was eight years older than McNee, and later moved Tim Russell's show to entirely cover McNee's time slot.

McNee also asserts that discriminatory animus may be inferred from statements made by WCCO management about wanting to have contemporary appeal, wanting to appeal to a younger demographic, McNee's listeners being older than the station's target demographic, and not wanting the station to sound "old." None of these statements, however, indicate that the station wanted to eliminate its older staff; rather, these statements reflect legitimate business concerns about maintaining an appropriate audience demographic to generate ad revenue. *See, e.g., Bills v. Sunshine Wireless Co., Inc.*, 824 F. Supp. 60, 63 (E.D. Va. 1993) (a station's business goal of targeting a younger demographic group is not sufficient evidence to show animus towards older employees). This case is arguably distinguishable from *Bills* because there is a single reference

in a memo–undated, yet prepared sometime in 1998 and apparently before McNee left WCCO–which indicates that the station wished to implement a strategy of employing younger airstaff. However, this single statement in a single memo, when viewed in light of the fact that McNee was actually replaced by an older announcer, is insufficient to meet McNee's burden in establishing a *prima facie* case.

**4. Breach of Contract and Tortious Interference with Contract**

McNee alleges that WCCO breached its employment contract with her by terminating her for reasons impermissible under the contract, failing to provide written notice of her termination, and failing to pay her the appropriate severance due her under the contract.

The first basis for McNee's breach of contract claim cannot stand. Pursuant to the terms of McNee's employment contract, WCCO could terminate that contract for "inefficiency, inability or unsuitability." McNee has raised a question of fact regarding whether she was genuinely terminated for inefficiency, inability or unsuitability. However, the only alternative reason McNee has offered for her termination, her theory of the case, is that she was terminated because of her gender, her age, or her complaints of discrimination. As a result, her claim for breach of contract, to the extent it questions the motive for her termination, is preempted by the Minnesota Human Rights Act. Although the law in this area is somewhat underdeveloped, the courts in this District have held "that the MHRA preempts a common law cause of action if: (1) the factual basis and injuries supporting the common law claim also would establish a violation of the MHRA; and (2) the obligations the defendant owes to the plaintiff, as a practical matter, are the same under both the common law and MHRA." *Pierce v. Rainbow Foods Group, Inc.*, 158 F. Supp. 2d 969, 975-76 (D. Minn. 2001).

However, the record creates genuine issues of fact regarding whether McNee was paid the appropriate severance due her under the contract and whether she suffered any damage as a result of WCCO's failure to provide her with written notice of her termination. There is no preemption issue with respect to McNee's contract claim as it relates to these issues, and thus the breach of contract claim survives.

McNee's allegations of tortious interference with contract, however, fail as a matter of law. The Minnesota Supreme Court has held that

> [A] company officer, agent or employee is privileged to interfere with or cause a breach of another employee's employment contract with the company, if that person acts in good faith, whether competently or not, believing that his actions are in furtherance of the company's business. This privilege may be lost, however, if the defendant's actions are predominantly motivated by malice and bad faith, that is, by personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff employee.

*Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 507 (Minn. 1991).

Whether discriminatory animus constitutes actual malice sufficient to remove a supervisor's actions from the scope of his employment is an interesting issue. However, it is one the Court need not address. At best, McNee could claim that Dickemann and Gustafson were acting outside of the scope of their employment because of improper discriminatory animus, but if that is true, then McNee's claim for tortious interference is preempted by the MHRA for the reasons discussed above. Accordingly, this claim either fails because Dickemann and Gustafson were acting within the scope of their employment, or it fails because it is preempted.

**5. Defamation**

McNee's defamation claim is based upon the press release issued by WCCO regarding McNee's departure from the station.[4] The specific statement read:

> WCCO Radio announced today that Ruth Koscielak [McNee] has left the station. WCCO Radio operations manager Chuck Dickemann said, "The two and one-half hours previously assigned to Ruth will now be programmed by our current air staff."

The press release then described the new lineup. The release continued:

> According to Jim Gustafson, WCCO Radio vice president and general manager, "This new lineup provides our listeners with consistent programming while addressing the station's need to strengthen our midday audience. We continue to be committed to be responsive to our listeners and are challenged to maintain our overall leadership position in Minnesota radio while growing every hour of our broadcast day."

McNee asserts that the press release is impliedly defamatory because it suggests that she was a weak link in WCCO's lineup and that her departure was part of an overall plan to strengthen that lineup.

Minnesota law recognizes that statements which are not defamatory on their face may nevertheless by construed as defamatory if they are juxtaposed in such a way as to imply a defamatory connection between them or if the statements omit key facts which would neutralize the defamatory implication of the statements. *See Diesen v. Hessburg*, 455 N.W.2d 446, 450 (Minn. 1990). "If the words are capable of the defamatory meaning, it is for the jury to decide if they were in fact so understood." *Utecht v. Shopko Dep't Store*, 324 N.W.2d 652, 654

---

[4] In McNee's responsive memorandum, she seems to focus more on Channel Five's news report regarding the press release rather than the press release itself. Channel Five's news report makes explicit reference to the fact that WCCO did not offer any reason for McNee's departure. Moreover, the news report condensed the press release. To the extent that McNee's defamation theory is based upon the implication drawn from the juxtaposition of statements, this condensation is highly significant.

(Minn. 1982). However, the court is charged with making the initial determination of whether the statements are capable of being interpreted as defamatory. *See Marudas v. Odegard*, 10 N.W.2d 233, 234 (Minn. 1943).

In the case at bar, the Court concludes that the statement at issue is not susceptible to a defamatory interpretation. The statement by Gustafson about strengthening the midday audience is sufficiently separate from the announcement of McNee's departure that any connection between the two could only be drawn if viewed with the most jaded eye. There is no artificial juxtaposition of statements designed to create an inference beyond the plain meaning of the statements, and there is nothing defamatory about the statements on their face. WCCO's failure to praise McNee or thank her cannot be considered defamatory; there is no legal obligation upon an employer to publicly praise a former employee, and the Court has found no case which holds that an employer's silence regarding an employee can be construed as criticism.

Because the Court concludes that the press release cannot be construed as defamatory, the Court grants Defendants summary judgment on McNee's claim of defamation.

**6. Intentional Infliction of Emotional Distress**

With respect to McNee's claim for intentional infliction of emotional distress, the Court agrees that the conduct of WCCO, Dickemann, and Gustafson, as alleged by McNee, does not, as a matter of law, rise to the level of atrocity so that "it passes the boundaries of decency and is utterly intolerable to the civilized community." *Strauss v. Thorne*, 490 N.W.2d 908, 913 (Minn. Ct. App. 1992). Indeed, in response to Defendants' motion, McNee does not even offer an argument in support of her intentional infliction of emotional distress claim. The Court grants Defendants' motion with respect to this claim.

**7. McNee's Motions**

McNee has brought a motion to strike certain portions of Defendants' Memorandum of Law in Support of Motion for Summary Judgment to the extent that those passages describe or rely upon testimony given by McNee's former attorney. McNee further moves to strike argument relating to an improperly submitted expert report and findings by the Minnesota Department of Human Rights (on the grounds that such findings lack probative value and would be inadmissible at trial). The Court has not relied upon any of the objectionable documents, testimony, or arguments in reaching its decision today. Indeed, the Court notes that none of the objectionable documents testimony, or arguments would have had any effect on the Court's ruling one way or the other. Accordingly, rather than devoting judicial resources to an extensive and needless review of the admissibility of these materials, the Court denies McNee's motion as moot. Any remaining issues of admissibility will be addressed in the context of pretrial motions *in limine*, in the event that this matter does not settle.

McNee has also brought a motion to supplement the briefing on this matter. The Court denies that motion. The proffered supplemental briefing is untimely and, again, would have no effect on the outcome of this motion.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. No. 75) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a. The motion is **GRANTED** as to Plaintiff's claims, as against all Defendants, for age discrimination, defamation, and intentional infliction of emotional distress, and those claims are **DISMISSED WITH PREJUDICE**.

b. The motion is **GRANTED** as to Plaintiff's claim, as against Defendants Dickemann and Gustafson, for tortious interference with contract, and that claim is **DISMISSED WITH PREJUDICE**.

c. The motion is **DENIED** as to Plaintiff's claims, as against Defendants Infinity Broadcasting Corporation and Infinity Media Corporation d/b/a WCCO AM, for gender discrimination, reprisal, and breach of contract.

d. The motion is **DENIED** as to Plaintiff's claim, as against Defendants Dickemann and Gustafson, for aiding and abetting unlawful discrimination.

2. Plaintiff's Motion to Strike Portions of Defendants' Memorandum of Law in Support of Its Motion for Summary Judgment (Doc. No. 81) is **DENIED**.

3. Plaintiff's Motion for Leave to File Supplemental Material (Doc. No. 90) is **DENIED**.

Dated: June 20, 2002

DONOVAN W. FRANK
Judge of United States District Court